Filed 9/11/20  P. v. Alford CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. JUSTIN LOUIS DARNELL ALFORD, Defendant and Appellant. | D074513 (Super. Ct. No. JCF36467) |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher J. Plourd, Judge.  Remanded for resentencing, affirmed in all other respects.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Justin Alford participated in a home invasion robbery, along with Aaron Jackson and Kevin Scott, that resulted in the death of Donald Tarker.

A jury found Alford guilty of murder (count 1; Pen. Code[1] § 187, subd. (a)); first degree robbery (count 2, § 211); first degree burglary with a person present (count 3, § 459); battery with serious bodily injury on Andrew R. (count 4, § 243, subd. (d)) and Angela W. (count 5, § 243, subd.(d)); conspiracy to commit a crime (count 7, § 182, subd. (a)(1)); and making criminal threats (count 8, § 422, subd. (a).)  The jury also found that the murder was committed while Alford was engaged as a major participant in a conspiracy to commit robbery and burglary, as alleged in special circumstances to the murder charge.  (§ 190.2, subd. (a)(17).)  Thereafter, the superior court made a true finding that Alford had a strike prior and sentenced him to a total prison term of life without the possibility of parole plus a determinate term of 26 years four months.

Alford appeals and asserts the superior court improperly reversed its own ruling on a *Batson/Wheeler*[2] motion, thereby depriving him of his right to a trial drawn from a representative cross-section of the community and failed to properly instruct the jury that a coconspirator can commit an act outside the scope of the conspiracy, and on the lesser included offenses of second degree murder and involuntary manslaughter.  In addition, Alford raises a number of sentencing issues.  He asserts the court erred by imposing multiple five-year sentence enhancements pursuant to section 667, subdivision (a)(1) based on a single serious felony prior, the matter should be remanded to the superior court to allow the court to exercise its discretion to strike the remaining five-year enhancement, and that the sentence imposed

---

[1]    All further statutory references are to the Penal Code.

[2]    *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

2

on count 8 should be stayed pursuant to section 654.  We remand the matter for resentencing but affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

*May 25, 2016 Home Invasion*

Tarker, the primary victim, operated a marijuana dispensary out of his home in Salton City.  Alford and Jackson knew about the dispensary and, in May 2016, they decided to rob Tarker and steal the marijuana.

On May 20, Alford messaged Jackson and said, "I went to ol' boy house this morning.  I went right past it, too. . . .  And we need to go ASAP. . . .  It's waiting for us."  They needed a ride, though, as Tarker's house was approximately an hour away from where they lived and worked.  They asked Scott and he agreed to drive them to Tarker's.  On May 24, Alford asked Scott to call Tarker's phone and Scott texted Alford to report that Tarker did not answer.  Scott added, "I'll keep calling them.  We ain't paying for shit."

The next day, May 25, Tarker arrived home from the hospital after undergoing brain surgery related to head injuries he sustained in a separate home invasion that occurred approximately 30 days earlier.  That evening, Tarker had a number of friends over, including Andrew R., Angela W., and Angela's 16-year-old daughter Destiny.  Tarker was acting normal, talking with his friends and walking around the house.

At approximately 7:00 p.m., Scott picked up Alford and Jackson and drove to Tarker's.  Jackson was wearing a white T-shirt and black pants, and Alford was wearing gray jogging pants, gray shoes, and a "whitish grayish" shirt.[3]

---

[3]     Later, in the car, Scott noticed blood on Alford's shirt and handed him a blue sweater to put on.

They arrived and knocked on the front door of Tarker's house sometime between 8:00 p.m. and 9:00 p.m.  Tarker opened the door to speak with them but left the screen door closed and locked.  He then went into the kitchen and returned a couple of minutes later.  Tarker unlocked the screen door and one or more of the assailants charged in, causing him to yell, "no," and fall backwards onto the ground.

Destiny saw two young African-American men, whom she later identified as Alford and Jackson, enter the living room.  They were both wearing blue latex "doctor gloves."  Alford hit Angela and Jackson hit Destiny, knocking her out.

Andrew was hit on the left side of his eye but was not sure what hit him.  He had been drinking and smoking marijuana and did not recall much from the evening.  Angela heard Andrew get hit but did not see who hit him.  She heard Alford yelling and assumed it was him who hit Andrew, but she was not sure.

Alford asked Angela where the "stuff" was and threatened her, asking "Was this worth dying over?"  Alford continued to hit Angela, approximately 50 to 75 times, and she eventually pretended to be unconscious so he would stop.  She felt one of the men feel around her pants pockets for her phone and heard them find her and Destiny's purses.

Destiny eventually regained partial consciousness; she could hear the men yelling but she could not move or see.  She heard the front door shut and then came back into full consciousness.  Angela was bleeding, Andrew was unconscious, and her and Angela's phones and purses were missing.

After leaving the house, Jackson and Scott went to put the bags of marijuana in the trunk of Scott's car.  In their rush to open the trunk,

Jackson ripped the license plate holder off. According to Scott, Alford was the last to leave the house.

Angela waited a few minutes to ensure the men were gone and then crawled to the kitchen, found the house phone, and called 911. She told the operator that two people had come into the house and attacked them and that the individual who hit her was wearing a white T-shirt and black pants.

Around the same time, Imperial County Sheriff's Deputy E. Ramirez was driving down Highway 86 towards Salton City. He noticed a white car traveling northbound on the service road. The car drew his attention because the license plate cover was missing, causing the license plate lamps to be unusually bright.

Approximately nine minutes later, at 9:09 p.m., Ramirez received a dispatch call regarding the incident. Ramirez was near Tarker's house at that point and arrived on the scene just a few minutes later. He could see Angela in the kitchen, through a window, and noted that her face and hair were covered in blood. He entered through the front door and found a tall White adult male, later identified as Tarker, lying on the ground with his feet toward the door, unresponsive. Tarker was not breathing and Ramirez was not able to get a pulse. Another officer cleared the residence while Ramirez began CPR.

Emergency Medical Technicians (EMT's) arrived approximately 10 minutes later and took over treatment of Tarker. The medics were unable to revive Tarker and he was pronounced dead at the scene just before 10:00 p.m. A deputy coroner examined the body at approximately 11:30 p.m. Tarker had small lacerations and blunt force trauma injuries in several places on his body, including his head and back. In particular, there were "fresh" injuries to Tarker's right eye, right temple, left temple, and back consistent with

5

blunt force trauma. A forensic pathologist later confirmed that Tarker died from blunt force trauma inflicted within one hour of his death but could not determine whether there was one definitive injury, or blow, that caused his death.

Angela and Andrew were transported to the hospital via ambulance. Andrew had a one-inch long gash near his left eye and received eight to 10 stitches. Angela's nose was crushed, and her jaw was broken in three places. She was transported to a larger hospital for surgery and remained hospitalized for about a week. Destiny did not go to the hospital that evening, but she did experience chronic headaches for approximately two months after the assault.

*The Arrest and Investigation*

After the EMT's arrived, Ramirez put out a BOLO (be on the lookout) for the white car with the missing license plate cover that he had seen in the area just before receiving the dispatch call. The BOLO also identified three Black males as potential occupants, based on the descriptions given by the victims at the scene.

Meanwhile, Alford, Jackson, and Scott stopped at Brian's house to drop something off. While they were parked outside, Alford went through the purses and then threw them in a trashcan across the street. After leaving Brian's, they proceeded back toward Highway 86.

At 9:30 p.m., approximately 15 minutes after the BOLO went out, Agent Ascencio with the U.S. Border Patrol identified a white vehicle matching the description traveling down Highway 86, in the opposite direction as Tarker's residence. Ascencio notified dispatch and stopped the vehicle. As he approached, he noticed a strong odor of marijuana emanating

from the vehicle. Ascencio confirmed that there were three Black males in the vehicle and then returned to his vehicle to request backup.

When additional officers arrived, they secured the area and placed Alford, Jackson, and Scott in separate police vehicles. Ascencio then conducted a search of the vehicle and located several bags containing what appeared to be marijuana plants, a bag full of clothing with bloodstains, and a number of other items. In addition, officers discovered a camcorder and tripod that belonged to Tarker in the trunk and a baseball bat in the backseat of the car.

After learning the border patrol had stopped a vehicle matching the description he gave, Ramirez drove to the location of the stop and confirmed that the car was the same car he had seen earlier that evening. Scott was subsequently identified as the driver, and Alford and Jackson were identified as the two passengers.

Sergeant Masad, the lead investigator on the matter, was at Tarker's residence when he learned the car had been located. Shortly after receiving the call, he left the residence and took Destiny to the location of the traffic stop to see if she could identify the suspects. It was nearly 11:00 p.m. by the time they arrived and there was minimal lighting available. Destiny remained in the back of Masad's vehicle, and a deputy walked each of the suspects to the front the vehicle, one at a time. Destiny could not identify any of the suspects. She was certain that she had not seen Scott at Tarker's but was not certain as to Alford or Jackson.

Alford, Jackson, and Scott were processed for evidence and interviewed. There was blood on a dark-blue long-sleeved shirt worn by Alford, on Alford's socks and shoes, and on Jackson's white T-shirt. The clothing was collected,

7

and subsequent DNA testing indicated that Andrew was a primary contributor to the DNA in the blood.

Alford had a number of small cuts on his knuckles, consistent with the type of injuries typically sustained during an assault or fistfight, and his knuckles were swollen. They were no longer bleeding but appeared to be "fresh" as they were still reddish and not dark. Alford had two stacks of five-dollar bills and a bag of marijuana in his pockets. When asked if the money and marijuana belonged to him, he said that one stack of money was his, but admitted he took the other stack and the marijuana from Tarker's residence.[4]

Alford initially said that he was not at Tarker's and did not know anything about the home invasion. He said he got into a fight at his friend Brian's house, which was nearby in Salton City, and the blood on his clothing was his own. He said Scott picked him up after the fight and the police pulled them over shortly thereafter.

He then changed his story and admitted he had gone to Tarker's. He said his friend Brian told him there was marijuana in the bedrooms and assured him that no one would be home. He met Brian, Scott, and Jackson at a convenience store earlier that evening, discussed the plans, and then he, Scott, and Jackson went to Tarker. He said they had not actually gone to Brian's house and the blood on his pants was from a fight with a "cholo" before they left Indio. Alford claimed he was the last one to enter Tarker's house, went straight to the bedroom to put the marijuana in the bags, and did not touch any of the victims.

---

[4]    The court instructed the jury to consider Alford's statements only in deciding Alford's case, and not to consider them as to Jackson.

Jackson initially said that he was not involved in the plan, did not enter the house, and was just a lookout. He later admitted they had planned to steal the marijuana and said Tarker fell when they rushed through the door. He said Tarker was conscious after the fall and was trying to poke him with a metal object, but that he saw Tarker on the ground when they were leaving and thought he looked dead. Jackson also admitted that he went into the house and helped fill a duffle bag with marijuana.

Scott admitted that he was the driver and that he stole marijuana from Tarker's home but claimed that his involvement was "minor."

Masad interviewed Angela five days later, on May 31. He showed her three sets of six photographs (six-packs), each of which included a photograph of Alford, Jackson, and Scott. Angela did not identify Scott, but she did identify Alford and Jackson as the two men that she saw during the home invasion and further identified Alford as the individual who assaulted her.

A deputy sheriff went to look for Angela and Destiny's purses in the trashcan near Brian's house but all of the trashcans in the area were empty when he arrived. A neighbor told him the trash had been picked up earlier that morning, so he went to the city landfill and eventually located one of the purses in the trash that had been dropped off that day.

*Scott Agrees to Testify Against Jackson and Alford*

In January 2018, Scott entered a plea agreement and agreed to testify against Alford and Jackson.

In a follow-up interview with Masad, Scott said that Alford texted him and asked him to call Tarker to see if he was home. He drove Jackson and Alford to Tarker's house and, when they got there, Alford told him to knock on the door and ask for some "weed." Tarker said, "let me check" and went into the house, closing the screen door but leaving the main door open.

9

Tarker returned with a green bottle. He opened the door and Alford and Jackson rushed in. Alford told Tarker to lay down on the floor and asked him "where's the weed?"

Scott heard Alford and Jackson "tussling" with Tarker and Alford later told him that Tarker was trying to hit him with some sort of metal object. Scott indicated that both Alford and Jackson were fighting with Tarker, and that he saw Jackson punch Tarker and take the metal object away from him. It then became quiet and Alford ran toward him and handed him some gloves. He then helped pack a number of marijuana plants into bags. Scott and Jackson took the bags to the car and Alford stayed behind. Scott heard yelling and screaming and then Alford emerged with a bag and two purses.

Scott testified consistently with this account at trial. Specifically, Scott testified that Jackson wrestled the metal object away from Tarker and hit Tarker with his fist at least a couple of times. He said Alford then hit Tarker several times after Jackson removed the metal object and Tarker stopped moving shortly thereafter.

*Defense Case*

Dr. Mitchell Eisen, an expert in eyewitness identification, testified regarding eyewitness identifications. He opined a witness who recalled seeing two assailants and did not identify one of the assailants in the first of three photo arrays would be more likely to "pick" someone in the second and third arrays. He further explained that sometimes an identification is made based on suggestive elements in the photograph, as opposed to actual recognition.

Jackson testified on his own behalf at trial. Jackson testified that he was 20 years old at the time of the murder, that this was his first arrest, and that he had had not previously been convicted of any crimes. He met Scott

10

approximately six months before Tarker's murder and they both worked as security guards at a local grocery store.

He said that he went to Tarker's with Scott and Alford on May 25 but thought they were going to buy marijuana, not to commit any crimes. He said it was Scott who initially charged into the house when Tarker brought the marijuana out and opened the door. The door hit Tarker in the head, causing him to fall straight back and hit the back of his head on the ground. Alford handed Jackson a black bag and either he or Scott directed Jackson to go to the bedroom and fill the bag with marijuana. Jackson testified that he never entered the living room and did not assault anyone. When they had all gotten into the car to leave, Scott said he forgot his phone and went back into the house alone.

Jackson's hands were photographed on the evening of the murder and he did not have any injuries, cuts, or abrasions on his knuckles or anywhere else. He asserted that was because he did not touch anyone that evening.

A.G. testified that he previously shared a cell with G.V. and that Scott bragged to him and G.V. about killing Tarker. He said Scott told them he went back to the house a second time and "went too far." Specifically, A.G. testified that Scott said, "I feel sorry about what I did. And I went over [*sic*] my hands, and I killed the guy. And I should have never went there the second time. I put him away." In addition, Scott told A.G. and G.V. that he was going to point to someone else to "get out of it."

At the time of trial, A.G. was housed in the same module as Jackson. A.G. talked and played cards with Jackson but said that he was testifying voluntarily and not to benefit Jackson.

11

*Sentencing*

The jury found Alford guilty on all counts and found the special allegations to be true. The superior court sentenced Alford to a total prison term of life without the possibility of parole plus a determinate term of 26 years four months.

DISCUSSION

I.

*Batson/Wheeler Challenge*

Alford and Jackson are both African-American and were tried by a jury with no African-American jurors. The original jury pool included three potential African-Americans jurors, but one was dismissed for hardship and the prosecutor used peremptory strikes to remove the other two.

Defense counsel brought *Batson/Wheeler* motions after each peremptory strike and the superior court ultimately denied both motions. With respect to the second motion, the superior court initially found defense counsel had made a prima facie showing of discrimination, but then reversed itself the following morning after clarifying the record.

Alford contends the court's reversal of its original ruling on the second *Batson/Wheeler* motion constituted reversible error.

A. *Relevant Legal Principles and Standard of Review*

Both the state and federal Constitutions prohibit the use of peremptory strikes to remove prospective jurors based on race or group bias. (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*); *People v. Lenix* (2008) 44 Cal.4th 602, 612.) "The now familiar *Batson/Wheeler* inquiry consists of three distinct steps. First, the opponent of the strike must make out a prima face case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges. Second, if

12

the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications.  Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination." (*Scott*, at p. 383.)

With respect to the first step, a defendant establishes a prima facie case if there is evidence that allows " 'the trial judge to draw an inference that discrimination has occurred.' " (*People v. Clark* (2011) 52 Cal.4th 856, 904, quoting *Johnson v. California* (2005) 545 U.S. 162, 170.)  The court should consider the entire record up to the time of the motion, but certain types of evidence are particularly relevant.  (*Scott*, *supra*, 61 Cal.4th at p. 384.)  "Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong. [Citation.]  A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record . . . ." (*Ibid.*)

On appeal, we give deference to the superior court's ruling on *Batson/ Wheeler* motions and consider only whether substantial evidence supports the court's conclusions.  (*Lenix*, *supra*, 44 Cal.4th at p. 613.)  We presume the prosecutor used the peremptory challenges in a constitutional manner and, so long as the superior court makes a sincere and reasoned effort to evaluate the

13

reasons offered, we defer to the court's ability to distinguish bona fide reasons from sham excuses. (*Id*. at pp. 613-614.)

As the court in *Scott* explained, "a reviewing court may not rely on a prosecutor's statement of reasons to *support* a trial court's finding that the defendant failed to make out a prima facie case of discrimination. Although a court reviewing a first-stage ruling that no inference of discrimination exists 'may consider apparent reasons for the challenges discernable on the record' as part of its 'consideration of "all relevant circumstances" ' [citation], the fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no relevance at the first stage." (*Scott*, *supra*, 61 Cal.4th at p. 390.)

However, when the reason offered by the prosecutor is used to *bolster* the existence of prima facie case, reviewing courts "should not blind themselves to the record in the 'rare' circumstance that a prosecutor volunteers a justification that is discriminatory on its face." (*Scott*, *supra*, 61 Cal.4th at pp. 390-391.) "A proffered justification that is facially discriminatory must be weighed with the totality of the relevant facts to determine whether they give rise to an inference of discriminatory purpose and thus compel analysis of the subsequent steps in the *Batson/Wheeler* framework." (*Id*. at p. 391.)

Of particular relevance here, the court further explained, "[i]n the circumstance where (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror on the record, (3) the prosecutor provides a reason that is discriminatory on its face, and (4) the trial court nonetheless finds no purposeful discrimination, the appellate court should likewise begin its analysis of the trial court's denial of the *Batson/*

14

*Wheeler* motion with a review of the first-stage ruling. In that (likely rare) situation, though, the relevant circumstances, including the facially discriminatory justification advanced by the prosecutor, would almost certainly raise an inference of discrimination and therefore trigger review of the next step of the *Batson/Wheeler* analysis." (*Scott*, *supra*, 61 Cal.4th at pp. 391-392.)[5]

B. *Overview of the Strikes*

The superior court conducted voir dire in this case by seating 24 jurors at a time and allowing counsel to question all 24 potential jurors. The court then allowed the prosecutor and the defense attorneys to make alternating peremptory strikes on the first 12 jurors, filling the open seat after each strike with the remaining jurors in seats 13-24. When there were no more jurors in the pool of 24 to fill the first 12 seats, the court called additional jurors from the pool to fill the open seats and repeated the process.

Defense counsel for Jackson routinely asked jurors their thoughts on NFL players kneeling during the national anthem. For example, he asked one of the first prospective jurors: "[T]his past year, you know, in the National Football League, we had some players, during the playing of the national anthem, would take a knee as a form of protest. And you know, our

_____

[5] The *Batson* framework has become the subject of increased scrutiny in recent years. The California Supreme Court recently announced the formation of a workgroup to address, in part, "perceived shortcomings in the practical application of the [*Batson*] framework." (California Supreme Court News Release, "Supreme Court Announces Jury Selection Work Group," (Jan. 29, 2020) p. 1.) In addition, earlier this year, the legislature introduced Assembly Bill No. 3070, to address "both conscious and unconscious bias in the use of peremptory challenges." (Assem. Bill No. 3070 (2019-2020 Reg. Sess.).) This case is one in which the framework poses some particular challenges. Nevertheless, it remains the framework that we must follow.

illustrious President condemned that and referred to many of those people as 'those SOBs' and that the owners should fire them. What's your feelings on that?" Thereafter, he routinely asked the new jurors something like, "how do you feel about the NFL players kneeling during the national anthem?"

"Prospective Juror No. 12"[6] was the first African-American juror to be seated and questioned. Regarding the NFL question, he stated, "[t]o each his own. Do what you want to do." The prosecutor passed on "Prospective Juror No. 12" several times.

While "Prospective Juror No. 12" was still in the box, "Prospective Juror No. 7," the second African-American juror on the panel, was seated. He said he had a military background and answered the NFL question with "I don't have a problem with it at all. . . . That's what I fought for." As soon as "Prospective Juror No. 7" moved into the top 12 seats, the prosecutor used a peremptory strike to remove him. Defense counsel requested a side bar and, thereafter, the court excused "Prospective Juror No. 7." At the conclusion of that same round of strikes, the final potential African-American juror, "Prospective Juror No. 10," was placed in seat 24.

At the end of that day, the court invited counsel to put the sidebar discussion on the record. Defense counsel explained that he had raised a *Batson/Wheeler* challenge because "Prospective Juror No. 7" was one of only three prospective jurors who was African-American, and he did not believe there was anything in the juror's answers to justify the peremptory strike. The court then explained that it denied the challenge after finding defense counsel had not established a prima facie case. The court then noted, there

---

6     As noted, the prospective jurors moved seats throughout the process. For consistency and to avoid confusion, we refer to the prospective African-American jurors by the seat they were in when removed from the jury pool.

was another African-American prospective juror in seat 12 that the prosecutor had passed on, which indicated the prosecutor was not using race as a basis for the strikes.

The court then asked the prosecutor if she wanted to make a record of her reasons for striking "Prospective Juror No. 7" and the prosecutor raised two issues: 1) "he thinks it was weird or strange that the prosecution would call a witness who had been given a deal to testify and that he thought that only happened on TV, not in real life"; and 2) "he had no problem with the knee, so he said, which would indicate to me that he's anti-law enforcement." The court did not comment on the reasons at that time. However, the court noted there were only two potential African-American jurors remaining and asked the prosecutor to alert the court before using a peremptory challenge against either.

When questioning of the potential jurors resumed, "Prospective Juror No. 10" answered the NFL question by stating, "I'm ex-military. I have no problem with them demonstrating the way they did, where they did it. I served in the 1963 Olympic protest."

The prosecutor then discussed the "tennis player example" with the jurors. She said a person is wearing a tennis outfit, carrying a tennis racquet and a cannister of balls, and walking toward the park where the tennis courts are. Even though she doesn't tell you she's going to play tennis, you can infer her intent. She asked, "who here feels that is not enough to infer somebody's intent?" A juror, likely "Prospective Juror No. 10," responded that the person might be going to shoot a tennis commercial and that he would like to see her

17

actually playing tennis.[7]  However, he then clarified, "I didn't say I would have to.  I would think looking at her walk to the tennis court, I'm not sure she's going to play tennis, going to watch tennis."  When asked what would make you think she is going to play tennis, he said "maybe she has a partner—tennis racquet and her opponent walking together, maybe going to play a game."

After "Prospective Juror No. 10" moved into seat 10 but before the prosecutor had a chance to exercise a peremptory strike against him, the court excused "Prospective Juror No. 12" for hardship, leaving "Prospective Juror No. 10" as the only potential African-American juror.  After further questioning, the court held a conference with counsel, outside the presence of the jury, and the prosecutor indicated she intended to use her next peremptory strike against "Prospective Juror No. 10."

The court stated, "[i]f you were going to use that peremptory challenge, I would have to find a prima facie case has been made . . . because you've passed on him a number of times."  The prosecutor responded that she had not passed on "Prospective Juror No. 10" as he was just recently moved from seat 24 to seat 10, but that she had passed on "Prospective Juror No. 12" a number of times before he was excused for hardship.  The court noted the

---

7    The record is not clear as to which juror responded.  However, the prosecutor later offered this response as her reason for using a peremptory strike against "Prospective Juror No. 10."  Defense counsel did not object or assert it was not "Prospective Juror No. 10" who gave these responses at that time, and although Alford attempts to reserve the issue, he also does not explicitly assert or argue that it was not "Prospective Juror No. 10" on appeal.  We therefore presume it was "Prospective Juror No. 10" who gave these responses.

18

court reporter was not available and asked the prosecutor to state her reasons for striking "Prospective Juror No. 10."

The prosecutor raised the tennis player example, and the court stated, "that question is problematic and to allow it to be used to exercise a peremptory challenge . . . would not be appropriate." Accordingly, the court stated if the prosecutor were to use the peremptory challenge, the court would have to grant a motion to strike the entire panel and start over again, so the court would not allow the prosecutor to use a peremptory challenge against "Prospective Juror No. 10."

The court addressed the issue again at the end of the day. It noted the prosecutor had used one other peremptory strike against an African-American juror, "Prospective Juror No. 7," but that it had not made a prima facie showing. The court further added that the prosecutor had relied on the NFL question in striking "Prospective Juror No. 7" and noted, "[h]e was very enthusiastic, he was very emotionally—you know, his answer was a little bit farther than most on that particular issue." Accordingly, the court stated it did not have a problem finding the prosecutor's reasons with respect to "Prospective Juror No. 7" were not pretextual.

The prosecutor asked if the court had also considered the response of "Prospective Juror No. 10" to the NFL question. The court indicated the prosecutor had not raised it before but nevertheless said it did consider his answer and explained "he didn't have a problem with it because, you know, he believed in the First Amendment, in the freedoms that come with that[,] that he fought for in the military. My sense was that he wasn't all in favor of that, but they have a right to do what they do. A lot of people look at that differently. They say, well, they don't agree with it, but people have a First Amendment right and so forth, and that's sort of where I saw based upon his

19

body language, how he was answering it." Finally, the prosecutor had passed on "Prospective Juror No. 12" a number of times and the court agreed.

The next morning, the court raised the issue once again. The court explained it had reviewed the record and discovered the prosecutor was correct when she stated she had not previously passed on "Prospective Juror No. 10." The court indicated it was going to reconsider its ruling as a result and asked defense counsel to formally make the *Batson/Wheeler* motion. After further argument, the court noted the prosecutor had passed on "Prospective Juror No. 12" (Riven) but had not passed on "Prospective Juror No. 10" and found defense counsel had not made a prima facie showing that the strike was discriminatory. The court invited the prosecutor to put her reasons for the strike on the record and she raised both the tennis player example and the NFL players kneeling issue. The court did not comment on the reasons but reiterated its ruling that the defense had not made a prima facie showing of discriminatory purpose.

C. *Analysis*

1. *"Prospective Juror No. 7"*

Alford relies on *People v. Gutierrez* (2017) 2 Cal.5th 1150 (*Gutierrez*) to assert the superior court did not make a "sincere and reasoned attempt" to evaluate the prosecutor's justification for using a peremptory strike against "Prospective Juror No. 7." (See *id*. at p. 1159.) Alford's reliance on *Gutierrez* is misplaced.

In *Gutierrez*, the People did not dispute that the defendants had made a prima facie case and, thus, on appeal, the court was focused on the second and third steps of the *Batson/Wheeler* framework. (*Gutierrez, supra*, 2 Cal.5th at pp. 1156-1157.) To the contrary, here, the court denied the initial *Batson/Wheeler* motion as to "Prospective Juror No. 7" based on its finding

20

that defense counsel had not established a prima facie showing. Although the court invited the prosecutor to put her reasons for striking "Prospective Juror No. 7" on the record, it did so only after making its ruling that the defense had not established a prima facie case for discrimination. Accordingly, the superior court was not required to make a "sincere and reasoned attempt" to evaluate the prosecutor's reasons for the strike. (See *Scott*, *supra*, 61 Cal.4th at pp. 383, 390.)

Focusing on the first step in the *Batson/Wheeler* analysis, we agree with the superior court's finding that no prima facie case had been established by the prosecutor's use of a peremptory strike against "Prospective Juror No. 7." As the superior court noted, the prosecutor had not struck any other African-American jurors at that point, but had passed on another, "Prospective Juror No. 12," a number of times. The single peremptory strike of an African-American juror, while another remained on the panel, did not give rise to an inference of discriminatory purpose. (See *Scott*, *supra*, 61 Cal.4th at p. 383; *People v. Christopher* (1991) 1 Cal.App.4th 666, 673 (*Christopher*) ["prosecutor's challenge of one or two prospective jurors of the same racial or ethnic background as the defendant will not establish a prima facie case of impermissible group-based bias in the absence of other significant supporting evidence"]; *People v. Box* (2000) 23 Cal.4th 1153, 1188-1189 (*Box*), disapproved on another ground *in People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10 [no prima facie case where "only basis for establishing a prima facie case cited by defense counsel was that the prospective jurors—like defendant—were Black"].)

Alford provides no authority to the contrary, but asserts the cases cited by the People are distinguishable because, here, defense counsel also argued there was nothing in the juror's answers that indicated he could not be fair

21

and impartial.  We disagree.  The assertion there was not a valid, nondiscriminatory reason for the peremptory strike is inherent in any *Batson/Wheeler* challenge.  (See *Scott*, *supra*, 61 Cal.4th at p. 383.)  Accordingly, this general statement by defense counsel is not sufficient to distinguish this case from others in which courts found no prima facie showing based on peremptory strikes against one or two prospective jurors of a certain race.  (See *Christopher*, *supra*, 1 Cal.App.4th at p. 673.)

In any event, even if we were to consider the superior court's evaluation of the prosecutor's stated reasons for striking "Prospective Juror No. 7," we would not find evidence of purposeful discrimination.  As Alford concedes, Scott was a key witness for the prosecution and "Prospective Juror No. 7" had indicated at least some reservations about witnesses being given a "deal" in exchange for their testimony.  Alford points out that "Prospective Juror No. 7" later indicated he would still be able to listen to the witness but, even with that qualification, the prosecutor could have had legitimate concerns given how significant Scott's testimony was to the overall case.  (See *People v. Jones* (2011) 51 Cal.4th 346, 368 [concerns a potential juror may look down on certain witnesses was a sufficient basis for a peremptory strike].)

Moreover, the prosecutor also raised the response of "Prospective Juror No. 7" to the NFL players kneeling question and the superior court later noted the juror's response was very emotional and "a bit farther than most on that particular issue."  Alford argues other jurors gave similar responses, but the superior court's discussion suggests otherwise.  We give deference to the superior court's ruling and, in particular, to the court's ability to make judgments based on subtle nuances in the juror's response based on, for example, the juror's attitude, body language, and facial expressions.  (See *Lenix*, *supra*, 44 Cal.4th at pp. 613, 623.)

### 2. *"Prospective Juror No. 10"*

The analysis with respect to the peremptory strike of "Prospective Juror No. 10" is more complex. Here, we have a rare circumstance in which the superior court initially rejected the prosecutor's explanation of the peremptory strike. (*Scott, supra*, 61 Cal.4th at pp. 391-392.) However, it is important to note that the superior court did not find the prosecutor's reasons to be facially discriminatory and, instead, found the tennis player example was "problematic" and, thus, not sufficient to overcome the prima facie showing. (See *ibid.*) Moreover, the ruling was based, at least in part, on the superior court's inaccurate recollection of the prosecutor's use of peremptory strikes. Thus, the superior court's comments regarding the prosecutor's explanation cannot be ignored, but we must also consider them in context and along with the totality of relevant facts. (See *ibid.*)

Having done so, we conclude substantial evidence supports the superior court's conclusion defense counsel did not make out a prima face case. (See *Scott, supra*, 61 Cal.4th at p. 383.) Ultimately, the prosecutor exercised peremptory strikes against two out of the three African-American jurors in the pool. However, the prosecutor passed several times on the third African-American prospective juror and, presumably, would have accepted a panel with an African-American juror had the third not been excused for hardship. (See *Scott*, at p. 383; *Christopher, supra*, 1 Cal.App.4th at p. 673; *Box, supra*, 23 Cal.4th at pp. 1188-1189.) Alford asserts passing on another juror of the same race is not dispositive. (See *Gutierrez, supra*, 2 Cal.5th at pp. 1170-1171.) Nevertheless, it is a significant factor, particularly where, as here, the prosecutor struck only two other jurors of the same race.

When the superior court made its original ruling that a prima facie case had been shown, it was under the mistaken impression the prosecutor

23

had previously passed on "Prospective Juror No. 10" and had used a peremptory strike against him only after "Prospective Juror No. 12" was released for hardship. Instead, though, the prosecutor used a peremptory strike against "Prospective Juror No. 10" at her first available opportunity. Thus, the true circumstances indicate the prosecutor was planning to strike "Prospective Juror No. 10" based on his answers and was willing to leave another juror of the same race on the panel.

Moreover, even if defense counsel had made a prima facie showing, the prosecution's explanation was not facially discriminatory and did not suggest purposeful discrimination when considered along with the totality of facts. (*Scott*, *supra*, 61 Cal.4th at p. 383.) The prosecutor's primary reason for striking "Prospective Juror No. 10" was his response to the tennis player example. Specifically, the prosecutor asserted "Prosecutive Juror No. 10's" response was different from all the other jurors and was not the logical response one would expect given the set of facts presented.

The superior court determined that was not sufficient to overcome the prima facie showing because the hypothetical itself was problematic, and Alford argues we should defer to the superior court's original analysis. However, the superior court did not find the prosecutor's explanation to be facially discriminatory and did not rely on his impressions of the juror in reaching that conclusion. Instead, in the context of the court's mistaken understanding of the timing of the peremptory strike, the court considered the hypothetical the prosecutor offered to be "pretty weak" and therefore concluded it was not sufficient to overcome the prima facia showing of discriminatory intent.

While we consider the superior court's comments regarding the prosecutor's explanation, we do so along with the totality of relevant facts.

24

(*Scott*, *supra*, 61 Cal.4th at pp. 391-392.)  In that context, we conclude the prosecutor's explanation, while perhaps weak, was nevertheless sufficient to overcome any minimal inference of discriminatory purpose arising out of the prosecutor's use of peremptory strikes against two of the three African-Americans in the jury pool.  (See *id*. at p. 383.)  The juror's willingness to accept circumstantial evidence was a valid concern for the prosecutor, given the nature of the evidence in the case, and the response of "Prospective Juror No. 10" was sufficiently different from the other jurors to raise at least an inference that he was less likely to convict the defendants in the absence of more direct evidence.  (See *People v. Miles* (2020) 9 Cal.5th 513, 546 [indication juror might question DNA evidence central to prosecutor's case formed a sufficient basis for a peremptory strike]; see also *id*. at pp. 616-617 (dis. opn. of *Liu, J.* [discussing the need to rethink the *Batson* framework].)

In an attempted comparative analysis, Alford argues another juror, "Juror No. 6" responded similarly to a different hypothetical about a clerk at a supermarket closing down a checkout lane.  However, Alford concedes "Juror No. 6" was initially confused by the example and, moreover, when the prosecutor followed up with the tennis player example, "Juror No. 6" agreed the woman was going to play tennis.  Thus, it is reasonable to infer the prosecutor determined "Juror No. 6" would be more likely to accept circumstantial evidence.  (Cf. *Miller-El v. Dretke* (2005) 545 U.S. 231, 232 [comparative analysis suggests discriminatory purpose where White jurors gave similar responses but were not struck].)  Alford also argues the prosecutor did not offer "Prospective Juror No. 10" another example, but there was no indication "Prospective Juror No. 10" was confused by the tennis player example like "Juror No. 6" initially was with the checkout example.

Alford also asserts this case is similar to *People v. Silva* (2001) 25 Cal.4th 345, but it is not.  There, the prosecutor asserted the juror was struck based on answers suggesting an unwillingness to impose the death penalty, but the California Supreme Court concluded the juror's answers did not support the prosecutor's stated reason since the juror did also indicate he would impose the death penalty if warranted.  (*Id*. at pp. 376-377.)  By contrast, here, the prosecutor was not concerned with the juror's willingness to impose a specific punishment, but rather with the way in which "Prospective Juror No. 10" would evaluate the evidence throughout the trial.  Moreover, "Prospective Juror No. 10" did not indicate he would convict the defendants based on circumstantial evidence if warranted and, instead, stated he would want more.

Finally, Alford argues at length that the response of "Prospective Juror No. 10" to the NFL question was not markedly different from other juror's responses, and thus was not a valid nondiscriminatory basis for the peremptory strike.  The superior court seemed to agree, stating that the juror's response appeared to be based primarily in his belief in the First Amendment.  As the court also noted, the prosecutor did not raise this in her initial response; she simply questioned whether the court had considered it after the court commented on the more emotional response of "Prospective Juror No. 7."  We defer to the superior court's analysis of the tone of the juror's responses and do not find any additional support for the peremptory strike in the response of "Prospective Juror No. 10" to the NFL question.  Regardless, though, for the reasons already discussed, we find no error in the superior court's denial of Alford's *Batson/Wheeler* motion.

*The Superior Court Did Not Commit Prejudicial Error by Failing to Instruct the Jury That a Coconspirator Can Commit an Act Outside the Scope of the Conspiracy or on the Lesser Included Offenses of Second Degree Murder or Involuntary Manslaughter*

Alford raises several instructional errors.  He asserts the superior court erred by refusing to instruct the jury that a coconspirator can commit an act outside the scope of the conspiracy or, in the alternative, that there must be a "logical nexus" between the murder and the underlying felony, and by refusing to instruct the jury on the lesser included offenses of second degree murder and involuntary manslaughter.  In addition, Alford argues the cumulative effect of the instructional errors was prejudicial and requires reversal.  We address each of the asserted errors, independently and collectively, and conclude there was no prejudicial error requiring reversal.

A.  *Additional Background*

Defense counsel asked the superior court to instruct the jury with CALCRIM No. 417, but the court refused.  The court explained that the instruction was not appropriate because the defendants were not charged with any nontarget crimes under a conspiracy theory.  In other words, as the prosecutor explained, although they were all charged with conspiracy to commit robbery, neither defendant was charged with another person's crime.

Defense counsel persisted in requesting the instruction but also suggested, as an alternative, that the court add language instructing the jury, "a conspiracy member is not responsible for the acts of other conspiracy members that are done after the goal of the conspiracy has been accomplished" based on the evidence suggesting Scott went back into the house alone "to finish off Mr. Tarker."  The court once again denied the request.

Defense counsel then pointed out that CALCRIM No. 417 indicated the instruction should be given "when there's an issue whether the defendant is liable for the acts of a co-conspirator." The court responded by asking, "what acts of the co-conspirator are being alleged?" Defense counsel replied, "the crime of a murder in Count 1 committed by Kevin Scott" and, at that point, the court shifted the conversation to the instruction on count 1 for felony murder.

Based on the evidence suggesting Scott returned to the house alone to kill Tarker, as well as evidence indicating Tarker may have fallen and hit his head when the defendants charged in, defense counsel requested an instruction on second degree murder and involuntary manslaughter. Counsel acknowledged the prosecutor was proceeding on a felony murder theory, and not an aider and abettor theory, but argued it was error not to give a malice murder instruction because the defendants were charged under section 187, murder with malice aforethought. In response, the prosecutor pointed out that the defendants were charged specifically with "felony murder" in violation of section 187, subdivision (a), the general murder statute, and section 190.2, subdivision (a)(17), which relates specifically to special circumstance robbery or burglary felony murder. Accordingly, the prosecutor asserted the jury should be instructed only on felony murder.

The court agreed that it was clear from the start of the case that the prosecution intended to proceed only on a felony murder theory, and further pointed out that voir dire was conducted by all parties based on that understanding. The court then asked if either defendant was requesting an instruction on first degree premeditated, nonfelony murder and both confirmed they were not. After further discussion, the court concluded the

evidence did not support any theory other than felony murder and declined to give an additional instruction on second degree murder or manslaughter.

The court later returned to defense counsel's request to include language from CALCRIM No. 417 and concluded the instruction did not apply to the facts at issue. The court did, however, invite defense counsel to draft some additional language for the court to consider. The court ultimately did not instruct the jury with CALCRIM No. 417 or any similar language.

The superior court instructed the jury that Alford and Jackson were charged, in count 1, with murder, under a theory of felony murder. As part of the instruction on felony murder, the court explained:

"To prove that the defendant is guilty of first degree murder under this theory, the People must prove that:

"1. The defendant committed or was a member of a conspiracy to commit Robbery or Residential Burglary;

"2. The defendant intended to commit or intended that one or more of the members of the conspiracy commit Robbery or Residential Burglary;

"3. If the defendant did not personally commit Robbery or Residential Burglary, then a perpetrator with whom the defendant conspired, committed or attempted to commit Robbery or Residential Burglary;

"AND

"4. While committing Robbery or Residential Burglary the defendant or perpetrator caused the death of another person.

"A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.

"To decide whether the defendant and the perpetrator committed or attempted to commit Robbery or Residential Burglary, please refer to the separate instructions that I will give

29

you on those crimes. To decide whether the defendant was a member of a conspiracy to commit a crime, please refer to the separate instructions that I will be given to you on conspiracy. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder.

"The defendant must have intended to commit or been a member of a conspiracy to commit the felonies of Robbery or Burglary before or at the time that he caused the death.

"It is not required that the person die immediately, as long as the act causing death occurred while the defendant was committing the felony."

The jury was further instructed that Alford and Jackson were charged, in count 7, with conspiracy to commit residential burglary and robbery. As part of the instruction on that count, the court further explained:

"To prove that a defendant is guilty of this crime, the People must prove that:

"1. The defendant intended to agree and did agree with the other defendant or Kevin Scott to commit Residential Burglary or Robbery;

"2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit Residential Burglary or Robbery;

"3. One of the defendants or Kevin Scott or all of them committed at least one of the following alleged overt acts to accomplish Residential Burglary or Robbery."

The enumerated overt acts included, among others, communicating via text message regarding the plan to steal marijuana, driving to the house, putting on gloves, forcibly entering the house, and stealing the marijuana.

Finally, the court instructed the jury with special instruction 8.21.1 which states, in part, "[f]or the purpose of determining whether a killing has

30

occurred during the commission of a Robbery . . . [a] Robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with the property."

B. *Standard of Review and Applicable Legal Principles*

"When a defendant bases his contention of innocence on particular facts, he is entitled to have the jury instructed on the general law as it relates to those facts, if he submits proper instructions thereon." (*People v. Terry* (1970) 2 Cal.3d 362, 402.)  However, "the court need not give a pinpoint instruction if it is argumentative, merely duplicates other instructions, or is not supported by substantial evidence." (*People v. Hartsch* (2010) 49 Cal.4th 472, 500.)

The superior court has a sua sponte duty to instruct on lesser included offenses that are supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)  As with pinpoint instructions, though, the court "is not obligated to instruct on theories that have no evidentiary support." (*Ibid*.)  " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Ibid*.)  We do not weigh the evidence or evaluate the credibility of witnesses, as that is the purview of the jury. (*Ibid*.; *People v. Elize* (1999) 71 Cal.App.4th 605, 615; *People v. Manriquez* (2005) 37 Cal.4th 547, 584.)  We simply determine whether there was evidence " 'substantial enough to merit consideration' by the jury" that the defendant is guilty only of the lesser offense. (*Breverman*, at p. 162.)

We review both types of allegations regarding instructional errors de novo. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217.)

31

C. *Analysis*

   1. *The Superior Court Did not Err by Failing to Instruct the Jury Regarding Acts of a Coconspirator*

Alford argues the superior court should have instructed the jurors with CALCRIM No. 417 or at least the portion thereof that "a conspiracy member is not responsible for the acts of other conspiracy members that are done after the goal of the conspiracy has been accomplished." He contends this instruction was supported by Jackson and A.G.'s testimony suggesting Scott went back into the house alone and killed Tarker, and by the medical examiner's testimony that he could not be certain which blow actually resulted in Tarker's death. We disagree.

As the superior court explained, there was no need for the additional instruction because Alford was not charged with a crime committed by a coconspirator based on a conspiracy theory. Alford argues he was charged with the killing of Tarker based, in part, on a felony murder theory in which he was not the actual killer. However, an individual is guilty of first degree felony murder if the murder is committed during the perpetration of robbery or burglary. (§ 189, subd. (a).)

Under the law at the time of trial, the only intent required for felony murder was the intent to commit the underlying felony. (*People v. Stamp* (1969) 2 Cal.App.3d 203, 210.) A nonkiller was liable for the act of another resulting in death, even if the nonkiller was not physically present, so long as the act was part of one continuous transaction and was not completely unrelated to the underlying felony. (See *People v. Cavitt* (2004) 33 Cal.4th 187, 196-197 (*Cavitt*).) When the act resulting in death occurs during flight, the outer limits of the continuous transaction are established by the "escape rule," under which the continuous transaction of the underlying felony

continues until the felons have reached a temporary place of safety. (*People v. Wilkins* (2013) 56 Cal.4th 333, 345.)

Here, the act that resulted in death occurred during the continuous transaction of the felony, and there was not sufficient evidence to support an instruction on acts outside the scope of the conspiracy. There was evidence that Alford exchanged text messages with Jackson regarding the robbery as early as May 20, 2016, that Alford entered the house after discovering it was occupied, that Alford was directly involved in carrying out the robbery, and that Alford personally assaulted at least Angela and Tarker during the course of the robbery. In addition, Alford was arrested shortly after the robbery, along with Jackson and Scott, in the getaway vehicle, and while still in possession of the stolen goods.

Thus, even if the jury believed Scott went back into the house and delivered the final blow causing Tarker's death after Alford and Jackson left, the act was part of the continuous transaction of the felony, and there was no evidence to suggest Scott was acting outside the scope of, or in a manner completely unrelated to, the underlying felony. (See *Cavitt*, *supra*, 33 Cal.4th at pp. 196-197.) Moreover, the superior court did appropriately instruct the jury regarding the escape rule, which was consistent with the law of felony murder and allowed the jury to decide whether the robbery had concluded when Scott went back into the house, if they believed that he did. Accordingly, the superior court did not err by declining to provide the additional instruction regarding acts outside the conspiracy.

In a related argument, relying primarily on *Cavitt*, Alford asserts the superior court had a *sua sponte* duty to at least clarify that there must be a "logical nexus" between the underlying felony and the homicidal act at issue. (*Cavitt*, *supra*, 33 Cal.4th at pp. 203-204.) Alford did not request such an

instruction in the superior court and, thus, has likely forfeited this claim. (*People v. Valdez* (2004) 32 Cal.4th 73, 113 (*Valdez*).)  Regardless, though, even if we were to consider the merits, we would not find the argument persuasive.

In *Cavitt*, the California Supreme Court held there must be *some* logical connection between the murder and the underlying felony, but also clarified there is no requirement to prove that the killing was done to advance or facilitate the felony.  (*Cavitt*, *supra*, 33 Cal.4th at p. 201.)  As the court explained, "California law thus has long required some logical connection between the felony and the act resulting in death, and rightly so. Yet the requisite connection has not depended on proof that the homicidal act furthered or facilitated the underlying felony.  Instead, for a nonkiller to be responsible for a homicide committed by a cofelon under the felony-murder rule, there must be a logical nexus, beyond mere coincidence of time and place, between the felony the parties were committing or attempting to commit and the act resulting in death."  (*Ibid.*)

Alford argues there was substantial evidence in this case that Scott's actions were outside the scope of the conspiracy and amounted to an intervening, superseding act cutting off the logical nexus between the felony and the murder.  He relies on Jackson and G.V.'s testimony suggesting Scott killed Tarker for personal reasons, but the only "personal reason." Alford offers is that Tarker could recognize Scott as a perpetrator of the robbery.

Contrary to Alford's position, an act undertaken at the conclusion of the underlying felony, with the express purpose of escaping liability for that felony, is logically connected to the felony.  (See *People v. Armitage* (1987) 194 Cal.App.3d 405, 420-421 [stating that there may be a superseding cause of death only where the third party's conduct was "so unusual, abnormal, or

34

extraordinary that it could have not been foreseen"].)  Indeed, in *Cavitt*, the court indicated a murder to aid in escape is logically connected to the underlying felony.  (See *Cavitt*, *supra,* 33 Cal.4th at pp. 200-202.)  On the other hand, the court offered an example of a coconspirator killing a long-standing enemy that just happened to be walking by during the commission of the felony as one in which the act was not related to the underlying felony. (*Ibid*.)  Here, under this same type of analysis, Scott's alleged additional acts, undertaken to protect himself from liability for the underlying felony, would still be part of the continuous transaction of the robbery.

Although Alford relies on the reasoning in *Cavitt*, he also argues this case is distinguishable because, here, the robbers had reached a place of temporary safety with unchallenged possession of the stolen property before Scott went back into the home.  We disagree.  As discussed *ante*, the potential of felony-murder liability of robbery or burglary continues *through the escape* until the perpetrators reach a place of temporary safety.  (*People v. Cooper* (1991) 53 Cal.3d 1158, 1169.)  Again, accepting Jackson's version of the events as true, the assailants were still in the act of fleeing, and had not yet reached a temporary place of safety, when Scott returned to the home.  (See *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1375 [scene of robbery is not a temporary place of safety]; *People v. Salas* (1972) 7 Cal.3d 812, 823 [assailants " 'in hot flight with the stolen property' " had not yet reached a temporary place of safety].)

Moreover, the superior court appropriately instructed the jury regarding the scope and duration of the robbery, including the temporary place of safety language, and defense counsel made this exact argument to the jury.  Thus, the point of the requested instruction was readily apparent from the instructions given, and the evidence here did not suggest a need for

additional clarification.  Accordingly, the superior court did not err in refusing to give an additional pinpoint instruction on the scope of coconspirator liability.  (See *People v. Bolden* (2002) 29 Cal.4th 515, 559.)

> 2.  *The Superior Court Did Not Err by Failing to Instruct the Jury on the Lesser Included Offenses of Second Degree Murder or Involuntary Manslaughter*

We turn next to Alford's requested instructions on the lesser included offenses of second degree murder and involuntary manslaughter.

" 'Second degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder.' " (*People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358.)  "Involuntary manslaughter is the unlawful killing of a human being without malice aforethought *and without an intent to kill*.  [Citations.]" (*People v. McGehee* (2016) 246 Cal.App.4th 1190, 1208, internal quotation marks omitted.)

As a matter of law, a conviction for felony murder committed during a robbery or burglary can only be a conviction for first degree murder and, thus, there are no lesser included offenses.  (*People v. Mendoza* (2000) 23 Cal.4th 896, 908.)  However, an allegation of malice murder with deliberation and premeditation on its face gives rise to possible lesser included offenses of second degree murder, voluntary manslaughter, and involuntary manslaughter.  (*People v. Campbell* (2015) 233 Cal.App.4th 148, 159-160 (*Campbell*).)  Accordingly, when the accusatory pleading alleges malice murder, it may require the trial court to instruct the jury on lesser offenses of second degree murder, voluntary manslaughter, and involuntary manslaughter, when warranted by the evidence.  (*Id*. at pp. 159-160, 162.)

Here, the accusatory pleading did reference malice murder, but it did not allege deliberation or premeditation. Instead, the pleading clearly stated Alford was accused under a felony murder theory. Moreover, as the trial court pointed out, the prosecutor made clear that she was proceeding solely on a felony murder theory at the outset of the case. Accordingly, even if the accusatory pleading is read to include malice murder with premeditation and deliberation, the evidence presented did not warrant an instruction on the lesser crimes of second degree murder or involuntary manslaughter.

By all accounts, Tarker was killed in the course of the robbery that Alford and Jackson actively participated in. Although there was conflicting evidence regarding which assailant or which blow ultimately killed Tarker, the evidence indicated Tarker was killed in one of three ways: 1) when the assailants charged into the house; 2) as a result of one or more of the assailants beating him during the robbery; or, 3) as a result of the blows inflicted by Scott at the conclusion of the robbery.

As with the coconspirator instructions, Alford argues the evidence regarding Scott's return to the house indicates Scott acted outside the scope of the robbery but, for the same reasons discussed *ante*, we disagree. Even if Scott returned to the house after Alford and Jackson were in the car, they had not yet reached a temporary place of safety and there was no indication Scott killed Tarker for any reason unrelated to the robbery. And, in any event, the jury was instructed that the robbery ended when the assailants reached a temporary place of safety.

Alford argues this case is like *People v. Banks* (2014) 59 Cal.4th 1113, in which the California Supreme Court found an instruction on second degree murder was appropriate. (*Id*. at pp. 1160-1161.) There, the court concluded the instruction was required because there was sufficient evidence of malice

murder. (*Ibid*.) Specifically, although the murder occurred at an ATM, no money was taken and there was evidence of an argument between the victim and the assailant. (*Ibid*.) Thus, the court stated, "the evidence permitted the inference that defendant shot Foster with malice in the course of an argument or fight." (*Ibid*.) To the contrary, here, there was no evidence of an argument or motivation to kill Tarker that was not related to the robbery.

Finally, if we were to accept the theory that Scott went back to kill Tarker on his own, after the felony was complete and for purposes not connected to the felony, Alford, as a nonactor and no longer a conspirator, would not be liable for even the lesser included offenses. As such, there was not sufficient evidence to support the instructions on the lesser included offenses and the court did not err by refusing to give them.

### 3. *Alford Suffered no Prejudice as a Result of the Alleged Instructional Errors*

Even if the superior court did err in failing to provide either of the instructions, we would conclude that any such error was harmless.

In determining whether an instructional error is prejudicial, we apply the state law standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), and consider whether there is a reasonable probability that the jury would have reached a verdict more favorable to the defendant absent the error. (*People v. Falsetta* (1999) 21 Cal.4th 903, 925; see also *People v. Jandres* (2014) 226 Cal.App.4th 340, 359 [*Watson* standard applies to erroneous propensity instruction as propensity is not an element of the charged offense and conviction cannot be based on propensity evidence alone].) We consider a disputed instruction in light of the entire charge to the jury and determine whether there is a reasonable likelihood the jury misunderstood and misapplied the instruction with the understanding that the jurors are intelligent and capable of understanding all of the given

instructions.  (*People v. Moore* (2011) 51 Cal.4th 1104, 1140; *People v. Lopez* (2011) 198 Cal.App.4th 698, 708; *Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

Here, the jury was instructed, to prove felony murder, the prosecution had to prove the murder was committed during a robbery and was further instructed that a robbery is over once the perpetrators reach a place of temporary safety.  Based on that instruction, defense counsel argued the robbery was already complete when Scott went back into the house alone to kill Tarker.  Despite that argument, the jury concluded Alford was guilty of felony murder, and found the special circumstance true.

The verdict indicates the jury either did not believe the alternate theory that Scott went back alone to kill Tarker or, if they did, they did not believe the robbery was over.  Accordingly, there is no reasonable probability the jury would have found any different, or would have concluded Scott was acting independently, if they had received the additional coconspirator instruction.  Moreover, the fact that the jury found the special allegations true indicates they believe Alford's role in the crimes was significant and that they would not have chosen a lesser offense if given the option.

Further, as discussed *ante*, even if the jury believed Scott killed Tarker after he went back into the house alone, there would be no basis to find Alford guilty of second degree murder or involuntary manslaughter.  If the jury wanted an alternative, the more appropriate one would have been to find the special circumstance allegation not true, but the jury did not do that.

Finally, as we have concluded that there was no instructional error, and that any error was not prejudicial in any event, there can be no cumulatively prejudicial effect arising from the superior court's instruction of the jury.  (See *People v. Tully* (2012) 54 Cal.4th 952, 1020; *People v. Selivanov* (2016) 5 Cal.App.5th 726, 757.)

*Sentencing Issues*

Alford raises several issues with respect to sentencing, many of which the People concede.

A.  *The Superior Court Could Impose Only One Five-Year Enhancement on the Aggregate Determinate Term and the Matter Must be Remanded to Allow the Superior Court to Exercise Its Discretion to Strike the Enhancement Altogether*

First, Alford argues the superior court erred when it added several separate five-year sentence enhancements under section 667, subdivision (a)(1) to his sentence.  The People conceded this point and we agree.  Alford was subject to only one single five-year enhancement on the aggregate term under section 667, subdivision (a)(1).  (*People v. Sasser* (2015) 61 Cal.4th 1, 8-17 (*Sasser*); *People v. Minifie* (2018) 22 Cal.App.5th 1256, 1260-1262.)

In addition, Alford asserts, and the People concede, the matter must be remanded for resentencing to allow the superior court to exercise its discretion to strike the single five-year enhancement.  We agree on this point as well.

The version of section 1385, subdivision (b) in effect when Alford was originally sentenced in April 2018 did not authorize the superior court to strike an enhancement under section 667.  However, recent amendments, which went into effect on January 1, 2019, eliminated the prohibition on striking prior serious felonies pursuant to section 667.  (Stats. 2018, ch. 1013 (Sen. Bill No. 1393), §§ 1, 2, eff. Jan. 1, 2019.)  Accordingly, the trial court now has discretion pursuant to sections 1385 and 667 to strike or dismiss an enhancement for a prior serious felony conviction.  (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971 [concluding Sen. Bill No. 1393 amends sections 1385 and 667 to allow a court to exercise its discretion to strike or dismiss a prior

40

serious felony conviction for sentencing purposes].) These amendments apply retroactively to sentences not yet final at the time the amendments went into effect. (See *id.* at p. 973 [finding the amendment applies retroactively]; *People v. Pride* (2019) 31 Cal.App.5th 133, 142.)

Accordingly, we remand the matter to the superior court for resentencing, with instructions for the superior court to strike all but one of the five-year enhancements pursuant to section 667, subdivision (a)(1), and to further consider whether to exercise its discretion to strike or dismiss the remaining section 667, subdivision (a)(1) enhancement.

B. *The Superior Court Properly Declined to Stay Alford's Sentence on Count 8*

Finally, Alford contends the superior court erred by imposing separate punishments for count 5—the assault with serious bodily injury against Angela—and count 8—the criminal threats against Angela—as both were part of a single course of conduct.

Section 654, subdivision (a) states, in part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision . . . ." (§ 654, subd. (a).) It therefore precludes multiple punishments for either a single act or an indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294.)

" 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336.) "On the other hand, if the evidence discloses that a defendant entertained multiple

41

criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*People v. Perez* (1979) 23 Cal.3d 545, 551, fn. omitted (*Perez*).)

On appeal, we uphold the superior court's determination that a defendant harbored a separate intent and objective so long as it is supported by substantial evidence. (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

Here, the superior court found the intents were different for counts 5 and 8 and sentenced Alford to consecutive terms. That finding is supported by substantial evidence. As the superior court noted, the threats and beating of Angela was gratuitous, and beyond what was necessary to subdue her or get the information Alford sought. Alford hit her between 50 and 75 times. Her nose was crushed, and her jaw was broken in three places, and she had to be transported to a larger hospital for surgery.

Alford argues the threats were made at the same time and were, thus, a narrative of the beating. However, the intent for assault is, by definition, different from the intent for criminal threats. The mental state necessary for assault is the willful commission of an act that is likely to result in injury to another. (*People v. Miller* (2008) 164 Cal.App.4th 653, 662.) A criminal threat, on the other hand, involves mentally or emotionally terrorizing the victim. (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1047.) Thus, the intent and objective are different. (See *ibid.* [finding intent and objectives between torture and criminal threats sufficiently different to support the trial court's finding section 654 inapplicable].)

In addition, Alford points out that the prosecutor argued the jury could look at the surrounding circumstances, including the assault, when deciding

the criminal threats count. However, in making that argument, the prosecutor told the jury to look to the totality of circumstances, including the fact that she was being hit, but also that the assailants had broken into the home, that her daughter was unconscious, and that Andrew had also been hit. The fact that the assault, along with all of the other circumstances, made the threats more credible, does not negate the evidence indicating Alford had separate intent for each act.

Finally, Alford argues this case is distinguishable from *Mejia* because there was a continued series of acts there, whereas here the threats occurred during a singular battery. (See *Mejia*, *supra*, 9 Cal.App.5th at p. 1046.) We disagree. The intent required for the different criminal acts is not altered by the sequence of events.

Accordingly, we conclude the superior court did not err by imposing separate punishments for counts 5 and 8.

## DISPOSITION

The matter is remanded for resentencing with instructions for the superior court to strike all but one of the five-year enhancements pursuant to section 667, subdivision (a)(1), and to further consider whether to exercise its discretion to strike or dismiss the remaining section 667, subdivision (a)(1) enhancement. In all other respects, the judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:


HALLER, J.



GUERRERO, J.